## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. MOHAMMAD AL SHARAIREI, Defendant. | Case No. 14-cr-63-LTS-MAR **REPORT AND RECOMMENDATION** |

### I.  INTRODUCTION

Before me is the Government's motion for a hearing to determine the requisite nexus for forfeiture between the property subject to forfeiture and the Defendant's offense of conviction.  (Doc. 161.)  Defendant filed a resistance on March 16, 2023.  (Doc. 167.)  The Honorable Leonard T. Strand, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation.  On March 21, 2023, I held a hearing on the Government's motion.  (Doc. 169.)

At the hearing, the Government's Exhibit 1 (Forfeiture) was admitted without objection.  Government's Exhibit 1 is Puff N Stuff II Condensed Sales Analysis filed at Doc. 168.  Also discussed at the hearing was Government's trial exhibit 114, a spreadsheet explained in more detail below.  Defendant requested the Court take judicial notice of the trial transcript and the Presentence Investigation Report ("PIR") at Doc. 157.  I requested that the parties submit post-hearing briefs and call my attention to portions of the trial transcript they found relevant.  The Government's post-hearing brief appears at Doc. 172.  Defendant's post-hearing brief is at Doc. 171.

1

The Government called one witness at the hearing: Internal Revenue Service Criminal Investigation Division Agent Michael Hare. Agent Hare also testified at trial. I found him to be credible.

For the following reasons, I respectfully recommend that the District Court **grant** the Government's motion and enter a Preliminary Order of Forfeiture in the amount of $425,000.

## II. DISCUSSION

### A. *Defendant's Indictment and Conviction*

The operative indictment in the case at bar (Doc. 40) is the Superseding Indictment filed on March 22, 2017 which charged Defendant and his spouse with the following crimes:

Count 1: Maintaining a Drug-Involved Premises

Count 2: Conspiracy to Distribute Controlled Substance Analogues

Count 3: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity

Count 4: Conducting an Illegal Gambling Business

The Superseding Indictment also contained a forfeiture allegation that sought forfeiture to the Government of

> any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offense and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offense. The property to be forfeited includes, but is not limited to, the following: a money judgment in the amount of $425,000.

(*Id.*)

At trial, the jury received instructions on Count 1 and Count 2. I find it helpful at this juncture to set forth the elements of each offense as instructed by the Court. Count 1 required proof of the following elements:

2

*One*, from at least January 2012 and continuing through at least June 26, 2013, the defendant knowingly used or maintained a place, specifically, the Puff N Stuff II store located at 1545 1st Avenue SE, Cedar Rapids, Iowa;

*Two*, the defendant did so for the purpose of distributing one or more controlled substance analogues, specifically 5F-PB-22 and PB-22, knowing that the substances were intended for human consumption.

(Doc. 120-1 at 7.) Count 2 required proof of the following elements:

*One*, from at least January 2012 and continuing through at least November 2013, in the Northern District of Iowa, two persons reached an agreement or came to an understanding to distribute a controlled substance analogue.

*Two*, the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and

*Three*, at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding.

(*Id.* at 10.)

On September 12, 2022, a jury returned guilty verdicts against Defendant on Counts 1 and 2.

## B. The Parties' Arguments

The Government contends forfeiture of proceeds of the crimes for which Defendant was convicted is permitted under 21 U.S.C. Section 853 and Federal Rule of Criminal Procedure 32.2(b). The Government points out the Superseding Indictment contains the requisite forfeiture allegation seeking forfeiture of property for the crimes of maintaining a drug-involved premises and conspiring to distribute controlled substances. In this case, the Superseding Indictment notified Defendant the Government sought a money judgment in the amount of $425,000. The Government urges that this evidence,

3

taken together, shows Defendant's illegal activity generated millions of dollars in proceeds, far in excess of the amount it seeks.

Defendant argues there is a lack of proof that the store profited from the sale of drug analogues. He argues the business was operated "on the assumption the substances were not illegal." (Doc. 171 at 3.) In support of this argument, he points to statements by employees that legal items were sold at the store and the employees thought the store complied with the law. Defendant further argues there is no evidence that any substance sold before a controlled purchase on May 28, 2013 had been tested and shown to contain a controlled substance or analogue. Thus, he contends there is no evidence of illegal transactions. Defendant further points to testimony at trial that substances in the store were regularly tested and removed if the lab reported they contained controlled substances. This evidence, Defendant contends, tends to show the products sold prior to the search and seizure were not illegal.

Defendant additionally argues that substances with different chemical structures can have similar pharmacological effects. From this Defendant concludes that even if customers were buying substances that made them high, it does not establish the substances sold were illegal.

Defendant argues the Government is estopped from seeking a forfeiture judgment because law enforcement allowed sales to occur for "months if not years" prior to the raid. (Doc. 167-1 at 6.) Finally, Defendant asserts he has no assets and no ability to pay and, therefore, the imposition of a money judgment would be an unconstitutional excessive fine in violation of the Eighth Amendment's Excessive Fines Clause.

In its post-hearing brief, the Government asserts Defendant's estoppel argument has no bearing on a criminal forfeiture judgment. The Government notes that the Eighth Circuit Court of Appeals decision in *United States v. Smith* is controlling authority which permits the entry of a money judgment despite Defendant's alleged inability to pay. 656

F.3d 821, 827-28 (8th Cir. 2011.) The Government distinguishes cases Defendant relies upon in this regard.

## C. Legal Standards

Federal Rule of Criminal Procedure 32.2(b)(1)(A) provides,

> As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. *If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.* <u>If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.</u>

Fed. R. Crim. P. 32.2 (emphasis added.) In the case at bar the Government is not seeking to forfeit any specific property. Thus, the Court's task is not to determine if any "requisite nexus" is established between the crimes and any specific property as set forth in the italicized portion of the above quotation. Rather, the Court must determine the amount Defendant must pay as underlined above. Federal Rule of Criminal Procedure 32.2(b)(1)(B) permits the Court's determination to be based on evidence in the record, a written plea agreement, and "any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Because the forfeiture was contested, a hearing required by Rule 32.2(b)(1)(B) was conducted.

The Government bears the burden of proof to show by a preponderance of the evidence the nexus between the convictions and proceeds of the illegal activity.

The Eighth Circuit Court of Appeals has held:

> 21 U.S.C. § 853 provides that a defendant convicted of a drug trafficking offense "shall forfeit to the United States … any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." *Id*. § 853(a). Property subject to forfeiture "includes—(1) real property, including things growing on, affixed to, and

5

Case 1:14-cr-00063-LTS-MAR    Document 175    Filed 05/05/23    Page 5 of 19

found in land; and (2) tangible and intangible personal property, including rights, privileges, interests, claims, and securities." *Id.* § 853(b). Section 853(p) provides that "the court shall order the forfeiture of any other property of the defendant," if "as a result of any act or omission of the defendant," the property subject to forfeiture:

> (A) cannot be located upon the exercise of due diligence;
> (B) has been transferred or sold to, or deposited with, a third party;
> (C) has been placed beyond the jurisdiction of the court;
> (D) has been substantially diminished in value; or
> (E) has been commingled with other property which cannot be divided without difficulty.

*Id.* § 853(p)(1).

The district court ordered forfeiture of $10,000 in drug proceeds, but these funds could not be located. Smith had insufficient assets at the time of sentencing for the court to order forfeiture of substitute assets that could be seized immediately. Therefore, the court entered a money judgment for $10,000, and the question arises whether such a judgment is authorized by the provision of § 853(p) for forfeiture of "any other property of the defendant." This court has not addressed the point directly.

At least five circuits have held that § 853 permits imposition of a money judgment on a defendant who has no assets at the time of sentencing. We think their conclusion is sound. The statute is phrased broadly, allowing forfeiture of "any other property of the defendant," 21 U.S.C. § 853(p), without a temporal limit. When that broad text is considered together with the express statutory direction that the provision is to "be liberally construed to effectuate its remedial purposes," 21 U.S.C. § 853(o), there is little doubt that "any other property" extends to property acquired by the defendant after the imposition of sentence. As several courts have noted, a contrary interpretation would give defendants an incentive to dissipate ill-gotten assets in order to avoid a forfeiture sanction, a result that would frustrate the remedial purposes of the statute in contravention of § 853(o). The district court was authorized by § 853(p) to enter the money judgment.

*United States v. Smith*, 656 F.3d 821, 826 (8th Cir. 2011) (citations omitted). The following discussion from *United States v. Stewart* is useful in analyzing the method of calculation proposed in the case at bar:

6

Circumstantial evidence and estimated quantities may be used as evidence to support a money judgment. *See, e.g., United States v. Pierre*, 484 F.3d 75, 86 (1st Cir.2007) (affirming money judgment based on co-conspirator's estimates of drug proceeds collected per week over course of conspiracy, as corroborated by records of expenditures by defendant). As a general principle, extrapolation is an appropriate method by which to calculate a forfeiture money judgment. *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir.2009) (forfeiture order in food stamp fraud case properly entered in amount equal to loss amount that was calculated based upon extrapolation). When calculating a forfeiture order amount based upon extrapolation, the test appears to be whether the calculation is reasonable under the circumstances and supported by a preponderance of the evidence. *Id*. at 181 (finding it reasonable for the district court to discount the false assumption that every transaction over $50.00 was fraudulent and to estimate that only 60% of those transactions were actually fraudulent); *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir.1997) (affirming district court's calculation based on extrapolation).

. . .

To be entitled to a money judgment in a drug trafficking case under 21 U.S.C. § 853, the government must prove, by a preponderance of evidence, either: (1) that the money constituted or was derived from any proceeds the defendant obtained, directly or indirectly, as a result of a drug trafficking offense, or (2) that the money was used or was intended to be used, in any manner or part, to commit or to facilitate the commission of the drug trafficking offense. *Bieri*, 21 F.3d at 822. A court must liberally construe the statute's forfeiture provisions to effectuate its remedial purposes. *See Smith*, 656 F.3d at 827; 21 U.S.C. § 853(o). Money that "facilitates" the commission of a drug violation includes money that makes the commission of the violation easier or is used to assist in the commission of the violation. *United States v. Premises Known as 3639–2nd St., N.E.*, 869 F.2d 1093, 1096 (8th Cir.1989) (noting that the term "facilitate," as used in the context of the forfeiture statute is interpreted as encompassing activity making the prohibited conduct less difficult or 'more or less free from obstruction or hindrance'") (quoting *United States v. One 1977 Mark V Coupe*, 643 F.2d 154, 157 (3d Cir.1980)).

7

*United States v. Stewart*, No. 8:14CR288, 2015 WL 6039742, at *4 (D. Neb. Oct. 15, 2015).

## D. Findings of Fact

The jury convicted Defendant on both counts. The testimony at trial described the nature of the synthetic cannabinoid industry including the manufacture of synthetic cannabinoids ("SCs") by combining inert plant material with substance chemically similar to THC (the psychoactive component of cannabis) which is packaged and marketed as potpourri or incense. Testimony also described the efforts by persons in the industry to package and sell SCs so as to disguise the presence of illegal substances and the fact SCs are intended for human consumption despite warnings to the contrary. The testimony described industry awareness of advancement in regulations of SCs and efforts to avoid detection and/or the use of regulated SCs.

Trial testimony also described Defendant's relationship with SC distributor Charles Wolfe and Wolfe's advice on avoiding law enforcement attention by obtaining "does not contain" lab reports and other means, as well as Defendant's discussion with Wolfe about the comparative highs of different chemicals.

During the investigation, law enforcement conducted controlled purchases of SC products from Puff and Stuff II at 1501 1st Ave SE, Cedar Rapids, Iowa ("the store") which ultimately tested positive for controlled substance analogues in May and June of 2013.

The testimony described in detail the June 2013 seizure of hundreds of packets of SC products containing 5F-PB-22 and others containing PB-22, the seizure of sales records, and Agent Hare's review of the records as described below. For example, two brands of products that tested positive for PB-22 and 5F-PB-22 alone generated gross sales of more than $421,000.

The trial testimony also established Defendant's continued involvement in the distribution of SC after the June 2013 search and Defendant's admissions in pretrial custody that he had consumed K2 and was facing a "two-million-dollar K2 case." (Doc. 172 at 12.)

At the March 21, 2023 hearing, Agent Hare testified he has been an Internal Revenue agent in the Criminal Investigation Division since 2010 and was in the Cedar Rapids office from 2010 to 2017. Agent Hare was a certified public accountant before joining the IRS and was trained to conduct financial/criminal investigations. He was personally involved in the investigation of the sale of synthetic cannabinoids from the store. The store was operated by Defendant and his wife who is the named co-defendant. Agent Hare's involvement in the case included, *inter alia*, review of the store's financial records and testimony at trial.

Agent Hare described the investigation following the June 26, 2013 search and seizure. The sales records for the business were seized, including the records of register sales from early 2012 through the date of the seizure. Agent Hare reviewed boxes of register tapes from the store and noted that they showed a substantial portion of the store's business was from the sale of synthetic cannabinoid brands he recognized. With information from the store's seized computer, he prepared a spreadsheet using sales data from January of 2012 through June 26, 2013, the date of the search. Agent Hare found the digital data on the computer to be consistent with the physical record on the store's register tapes. The spreadsheet, Trial Exhibit 114, shows the sales of multiple brands of SCs in each month from January 2012 through June 26, 2013. These products were coded as "botanical sachets" in the store's inventory software. Total sales from the store during this timeframe were $1,826,641.92, of which $1,360,807.09 resulted from the sale of these sachets. Thus, 74% of the store's sales were from sachets.

9

Government Forfeiture Exhibit 1 contains a subset of the data shown on Exhibit 114. Agent Hare prepared Exhibit 1 to focus on certain brands of sachets that were physically removed from the store and Defendant's residence that had been tested by the Drug Enforcement Agency and shown to be synthetic cannabinoids. Exhibit 1 focused only on the approximately six-month period of sales from January 2013 to June 26, 2013, according to Agent Hare, to "conservatively" address the possibility that the contents of the various brands may have changed over time. By focusing on a six-month window prior to the seizure, the Government attempted to limit its judgment to an amount of proceeds derived from the sale of items it believed to a reasonable degree of confidence to be illegal. Agent Hare testified that the store's sales continued and even increased after the search and seizure in June 2013. Agent Hare testified in his experience that sellers at each level of distribution essentially doubled the sales price. He also opined that the profit from the conspiracy and operation of the drug-involved premises exceed the sum the Government seeks as a judgment.

As Defendant pointed out during cross-examination, there may have been changes over time in the chemical makeup of the SCs. That is, substances that were seized on June 26, 2013 and subsequently tested, may not have previously contained prohibited compounds. Thus, Agent Hare admitted that it was not possible to determine if products sold before the seizure contained the same prohibited compounds.

Additionally, I find the following facts from the Presentence Investigation Report (Doc. 157) to be true[1] and important to determination of this matter:

- between January 9, 2012, and June 26, 2013, Puff N Stuff II recorded gross sales from smokeable synthetic cannabinoid products

---

[1] Some of the paragraphs I rely upon are subject to objection, principally by Defendant. The objections will no doubt be resolved, as necessary, by the Court at sentencing. This Report and Recommendation is not intended to constrain the parties' argument or presentation of evidence regarding those objections. I recommend the Court modify any of my findings to be consistent with its ruling on those objections.

10

of $1,360,807.09. Sales of the smokeable synthetic cannabinoid products constituted approximately 74% of the gross sales from Puff N Stuff II during that period. (*Id.* at ¶ 15.)

- The "potpourri" products were the main money maker for the business. The packets which sold for $15 to $20 would be purchased for $5, and the packets which sold for $40 to $50 would be purchased for $18. (*Id.* at ¶ 16.)
- In 2022, the defendant told a cell mate at the Linn County Correctional Center in Cedar Rapids that he marked up his smokeable synthetic cannabinoid products at least 300% over his purchase price. (*Id.* at ¶ 23.)

### E. *Discussion*

#### 1. *The Government has met its burden of proof entitling it to a judgment in the amount of $425,000*

I see no difficulty in concluding that the Government has met its burden to show by a preponderance of the evidence the amount it seeks is for proceeds of the illegal operation of the store and the conspiracy. The Government's requested judgment is conservative and not overreaching. There is ample evidence that Defendant was engaged in the sale of analogue substances both before January 2012 and after the June 26, 2013 seizure. Observations by law enforcement, controlled purchases, and the testimony of multiple witnesses established these sales occurred and the sales were corroborated by the store's records. In addition, the evidence established Defendant was involved in the distribution of SCs after the seizure. Agent Hare testified that in August 2013, Defendant reported to law enforcement the theft of a large amount of the remaining synthetic cannabinoid from his vehicle at his residence. The DEA subsequently seized and tested these products which also tested positive for prohibited compounds. (*See* ¶ 17 of the PIR.) Law enforcement subsequently interviewed Defendant in 2014. Defendant admitted to the continued sale of synthetic cannabinoids after the June 26, 2013 seizure. In fact, sales from the store increased. (PIR at ¶ 20.)

Defendant does not question that the sale of the sachets occurred as much as he raises an essentially epistemological argument. That is, he questions how anyone can *know* whether the sachets sold contained illegal synthetic cannabinoid if they were not all tested. This concern is easily dealt with. First, the jury verdict resolves the question against Defendant. To find him guilty the jury must have concluded that the sachets were for human consumption and contained synthetic cannabinoids. The task at hand is not to determine in granular detail whether each sachet sold over the time in question actually contained a particular synthetic cannabinoid. Rather, the task is to determine the amount of the judgment that reflects the proceeds derived from the crimes.

The fact that the crime involves analogue controlled substances does not materially change the task at hand. Someone convicted of a conspiracy to distribute heroin or cocaine, for example, might allege that their product was adulterated or merely consisted of cutting agents. As discussed in *Stewart,* circumstantial evidence and reasonable extrapolation is necessary and permissible to determine the appropriate amount of a forfeiture judgment. It is neither possible or necessary to test each sachet that left the store, any more than it is to weigh and test each bindle sold by a cocaine dealer.

The evidence at trial and the hearing demonstrates that store patrons were purchasing products that contained illegal analogue substances for the purpose of consuming them to get high, as Defendant was aware. It is important to bear in mind that the jury verdict established a conspiracy to distribute illegal substances for the period of January 2012 to November 2013. Thus, while the jury's verdict did not determine how much of any SC Defendant sold, the conspiracy necessarily included the time period of January 2013 through June 26, 2013, the period the Government relies upon to establish the basis for a judgment.

Defendant also argues that the "store was operated on the assumption that the substances were not illegal." (Doc. 171 at 3.) Defendant does not explicitly state how

12

this argument is relevant to determining the amount of the forfeiture judgment. To the extent Defendant asserts he lacked criminal intent, the argument is without merit and, more to the point, was rejected by the jury. What I take from this argument is that the store was engaged in the sale of some legal products and that the store employees, at least, developed a belief that selling the sachets was legal. Thus, perhaps Defendant is arguing that neither he nor anyone else could not really *know* that his customers intended to consume the sachets and did so, rather than use them as potpourri.

However, the evidence supports the conclusion that Defendant well knew the sachets were being sold for the purpose of human consumption. Defendant smoked some himself, although he admitted preferring marijuana. The brand names on the packages (e.g., "Lights Out" and "Head Trip") are consistent with drug use and not scents to freshen up a family room.

Here, two brands of products that tested positive for PB-22 and 5F-PB-22 alone generated gross sales of more than $421,000. Given that $1,360,807.09 of the store's sales resulted from the sale of sachets during only a part of the proven conspiracy, I conclude that the requested forfeiture judgment of $425,000 is reasonably and conservatively extrapolated from the evidence presented and proven by a preponderance of the evidence.

### 2. *Defendant's estoppel argument is unavailing*

Defendant argues that the Government should be estopped from seeking a judgment against him merely because law enforcement was aware of his illegal activity and did not stop or warn him. This argument is, at best, wishful thinking. The evidence Defendant points to in support of this conclusion is the testimony of two employees who saw police (presumably Cedar Rapids Police officers) in the store. (Doc. 171 at 16.) One employee testified an officer was present while "potpourri" was on display and told the employee to call police if there were any problems. (*Id.*) The other employee testified

13

that officers would "come in and check out our inventory and see how the orderly running of the business was." (*Id*.) In addition, Defendant's note that Officer Furman made an undercover buy in May 2013 but did not warn the employees to stop selling SCs that could be illegal. (*Id*. at 16-17.)

Defendant acknowledges that to estop the Government he must establish "(1) the traditional elements of estoppel and (2) that the government conduct challenged amounts to 'affirmative misconduct.'" (Doc. 167-1 at 5) (quoting *Chien-Shih Wang v. Attorney Gen. of the United States*, 823 F.2d 1273, 1276 (8th Cir. 1987)). If a claimant satisfies the affirmative misconduct requirement, he then must prove the four traditional elements of estoppel: (1) a "false representation by the government"; (2) government intent to induce the claimant to act on the misrepresentation; (3) a lack of knowledge or inability to obtain true facts on the part of the claimant; and (4) the claimant's "reliance on the misrepresentation to his detriment." *Rutten v. United States*, 299 F.3d 993, 995 (8th Cir.2002) (citing *Story v. Marsh*, 732 F.2d 1375, 1383 (8th Cir. 1984)).

> As this Court has noted:
>
> The federal doctrine of equitable estoppel is applicable to actions brought in federal courts at law and equity. . . . In order to prevail on a traditional equitable estoppel theory, a party must prove that the party misrepresented a material fact and that the other party reasonably relied on that misrepresentation to its detriment. . . . The Supreme Court has made clear, however, that the government may not be estopped on the same terms as other litigants. . . . Indeed, although the Supreme Court has not adopted a categorical rule that equitable estoppel may not be used against the United States Government under any circumstances, it has come close. The Court expressly noted that it has reversed every case it has reviewed in which a lower court has applied equitable estoppel against the government. Nevertheless, to the extent that equitable estoppel is viable against the government, when estoppel is asserted, the party must prove, in addition to a material misrepresentation, affirmative misconduct by the government.

14

Case 1:14-cr-00063-LTS-MAR    Document 175    Filed 05/05/23    Page 14 of 19

*Bliek v. Palmer*, 916 F. Supp. 1475, 1492–93 (N.D. Iowa 1996), aff'd, 102 F.3d 1472 (8th Cir. 1997) (citations omitted.)

Defendant points to no case, let alone a criminal case, where the principle of equitable estoppel was applied to prohibit the United States Government (or any other sovereign) from obtaining a judgment of conviction because of law enforcement's alleged failure to timely intervene. Here, at best Defendant has established that some members of law enforcement were aware of the sale of "potpourri" and, in the case of Officer Furman, that he did not alert store employees to the products' probable illegality. This establishes none of the traditional elements of equitable estoppel (i.e., "that the party misrepresented a material fact and that the other party reasonably relied on that misrepresentation to its detriment,") let alone any affirmative misconduct by the government. *Id.*

The Government is not estopped by the failure to warn Defendant of his illegal conduct during an investigation. The Eighth Circuit has discussed law enforcement allowing illegal conduct to continue in the context of sentencing manipulation in *United States v. Torres:*

> Sentencing manipulation occurs when the government unfairly exaggerates the defendant's sentencing range by engaging in a longer-than-needed investigation and, thus, increasing the drug quantities for which the defendant is responsible. *See United States v. Shephard*, 4 F.3d 647, 649 (8th Cir. 1993). In order for sentencing manipulation to form the basis for a departure, the defendant bears the burden to prove by a preponderance of the evidence "that the officers engaged in the later drug transactions *solely* to enhance his potential sentence." *Baber*, 161 F.3d at 532. *"[I]t is legitimate for police to continue to deal with someone with whom they have already engaged in illicit transactions in order to establish that person's guilt beyond a reasonable doubt or to probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy."* *Shephard*, 4 F.3d at 649 (internal citation and quotation marks omitted). Police may also engage in "a legitimate pattern of increasing amounts of drugs" in order to determine

15

what quantity of drugs a defendant will deal. *Id.* If the court finds sentencing manipulation, it should grant a downward departure to the Guidelines range it believes would apply absent the manipulation, since such manipulation artificially inflates the offense level by increasing the quantity of drugs included in the relevant conduct. *See id.*

563 F.3d 731, 734–35 (8th Cir. 2009) (brackets in original; emphasis added). Here, Defendant points to nothing untoward about law enforcement's efforts to "to probe the depth and extent of a criminal enterprise." *Id.*

In the case at bar, there is no evidence that any law enforcement officer affirmatively advised Defendant or any store employee that the sales were legal. At most, law enforcement declined to warn the employees that the conduct might be illegal. Indeed, the sale of some of the sachets law enforcement may have seen in the store could have been legal if they did not contain analogue controlled substances. Moreover, Defendant cannot establish that he relied upon law enforcement's alleged inaction in any way. On the contrary, the evidence established that Defendant was well-aware of the possible illegality of the substances being sold, had communicated with Wolfe regarding different means to allude law enforcement detection and prosecution, and had actively schemed to defeat detection and prosecution. Under these circumstances, I conclude Defendant has not proven the elements of equitable estoppel.[2]

---

[2] In addition to these difficulties with his estoppel argument, Defendant never established that he was personally aware of any to the activities of law enforcement and relied somehow upon them. If the record does contain this information, Defendant fails to cite it. see also *ASARCO, LLC v. Union Pac. R.R. Co.*, 762 F.3d 744, 753 (8th Cir. 2014) ("Judges are not like pigs, hunting for truffles buried in briefs or the record.") Even if his employees may have been lulled into believing the sales were legal, Defendant never addresses how he, as the proprietor of the store and the person who ordered the products, became aware of the police presence in the store or reasonably relied on it to his detriment. Nor does he address how the United States might be estopped by the actions of local law enforcement. Thus, the argument simply fails to address, to say the least, important factual issues as well as legal issues involving agency and sovereignty.

### *3.      Defendant's Eighth Amendment Argument*

As Defendant acknowledges, the Eighth Circuit has held that 18 U.S.C. Section 853 permits the entry of a judgment against an indigent defendant. *Smith* stated,

> Smith finally avers that the money judgment is an excessive fine because he is indigent. A punitive forfeiture violates the Excessive Fines Clause if "the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 337, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). "[A] defendant's inability to satisfy a forfeiture at the time of conviction, in and of itself, is not at all sufficient to render a forfeiture unconstitutional, nor is it even the correct inquiry." *United States v. Levesque*, 546 F.3d 78, 85 (1st Cir.2008). Even if it appears at the time of sentencing that Smith cannot satisfy the forfeiture in the future, there is always a possibility that he might legitimately come into money. *Id*. Smith was highly culpable; he participated in a large drug conspiracy, storing over ten pounds of methamphetamine at his residence for distribution. The seriousness of his offense is reflected in the applicability of a 120–month statutory minimum sentence. *See* 21 U.S.C. § 841(b). The $10,000 money judgment, representing proceeds from Smith's drug trafficking offenses, is not grossly disproportional to those same offenses.

656 F.3d at 828–29. Defendant argues he has "no assets and no realistic chance of obtaining any" and he is not a U.S. citizen who faces deportation upon completion of a long sentence." (Doc. 167-1 at 9-10.) Thus, he asserts that the imposition of any money judgment would violate the Excessive Fines Clause. (*Id.*)

The facts surrounding Defendant's alleged inability to pay are not as clear cut as Defendant makes them out to be. The facts show Defendant profited greatly from the sale of SCs and used the proceeds to acquire houses. Defendant told the United States Probation Office that those houses had been "confiscated by the feds," but the record is otherwise silent on whether, in fact Defendant's interest in those properties has been wholly extinguished. (Doc. 157 at ¶ 80). Moreover, in June 2013, Defendant's wife disclosed Defendant's ownership of property in Jordan and an estimated net worth of $2

17

Case 1:14-cr-00063-LTS-MAR    Document 175    Filed 05/05/23    Page 17 of 19

million to $5 million. (It is unclear if the estimate included properties that were allegedly confiscated.) Ultimately, Defendant may accurately be predicting his inability to pay a judgment, but, as *Smith* noted, "there is always a possibility that he might legitimately come into money." 656 F.3d at 828–29.

Moreover, *Smith's* citation to *Bajakajian* makes assessment of Defendant's alleged indigence somewhat problematic. *Bajakajian* stated, "[A] defendant's inability to satisfy a forfeiture at the time of conviction, in and of itself, is not at all sufficient to render a forfeiture unconstitutional, *nor is it even the correct inquiry*." 524 U.S. 321, 337 (emphasis added). This suggests that Defendant's present poverty is insufficient to make the imposition of a forfeiture judgment unconstitutional. Here, Defendant's plea of poverty and his estimate of his pessimistic appraisal of his post-conviction potential is insufficient to avoid a forfeiture judgment.

Moreover, *Bajakajian* at least suggests the Court should not inquire into that issue. Rather, the Court should consider whether the judgment would be grossly disproportional to the offenses. Here, the imposition of a $425,000 forfeiture judgment is substantially less than the probable proceeds of the offenses, given the Government's effort to limit the judgment both in terms of the time and the proceeds from sachets the Court can reasonably conclude contained prohibited SCs. Thus, I conclude Defendant's objection to the entry of a forfeiture judgment on Eighth Amendment grounds should be overruled.

### III. RECOMMENDATION

For the foregoing reasons, I recommend that the Court enter a Preliminary Order of Forfeiture in the form of a money judgment against Defendant in the amount of $425,000. Pursuant to Federal Rule of Criminal Procedure 32.2(b)(1)(A), I recommend the Court "enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4)."

18

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 5th day of May, 2023.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa