# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No.  CR14-63-LTS |
| vs. | | |
| MOHAMMAD AL SHARAIREI, | | **ORDER ON REPORT AND RECOMMENDATION** |
| Defendant. | | |

## I.    INTRODUCTION

This matter is before me on a report and recommendation (R&R) by United States Magistrate Judge Mark A. Roberts on the Government's motion (Doc. 161) for a hearing pursuant to Rule 32.2(b)(1)(A) of the Federal Rules of Criminal Procedure.  Doc. 175. Judge Roberts recommends that I enter a preliminary order of forfeiture in the form of a money judgment against Al Sharairei in the amount of $425,000.  *Id.*  Al Sharairei has filed objections (Doc. 178) to the R&R.  Sentencing is scheduled for July 25, 2023.

## II.    BACKGROUND

Al Sharairei was charged in a superseding indictment (Doc. 40) with maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1) (Count 1) and conspiracy to distribute controlled substance analogues in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 2).  The superseding indictment also contained a forfeiture allegation seeking forfeiture of $425,000 in the form of a criminal money judgment.  *Id.*

Following a jury trial, Al Sharairei was found guilty of Counts 1 and 2.  Doc. 130.  There was no determination as to the entry of the forfeiture money judgment. Because the forfeiture is contested, the parties sought a hearing pursuant to Rule 32.2(b)(1)(B).  Judge Roberts held the hearing on March 21, 2023.  Doc. 169.  The

Government submitted Government Forfeiture Exhibit 1 (Doc. 168), a condensed sales analysis of the Puff N- Stuff II store located at 1501 1st Ave. SE, Cedar Rapids, Iowa, from January 1, 2013, through June 26, 2013. The Government presented testimony from Internal Revenue Service Criminal Investigation Division Agent Michael Hare. Judge Roberts also considered Government Trial Exhibit 114 and took judicial notice of the trial transcript and Presentence Investigation Report (PSR). The parties submitted post-hearing briefs (Docs. 171, 172) and Judge Roberts issued his R&R on May 5, 2023.

## III. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*,

2

333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## IV.  ANALYSIS

### A.  The R&R

Judge Roberts observed that because the Government seeks a personal money judgment, the court need not determine whether the requisite nexus exists between the property and the offense but need only determine the amount of money that the defendant will be ordered to pay. *See* Fed. R. Crim. P. 32.2 ("If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.  If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.").  Judge Roberts summarized the evidence presented at trial, including the sale of synthetic cannabinoids (SCs) by Al Sharairei at his Puff N' Stuff II store in Cedar Rapids, Iowa.  On June 26, 2013, law enforcement seized hundreds of SC products and sales records from the store.  Two brands of products that tested positive for PB-22 and 5F-PB-22 generated gross sales of more than $421,000.  Hare reviewed the sales records of the business from early 2012 through the date of the seizure and prepared a spreadsheet (Government Trial Exhibit 114) showing the sales of multiple brands of SCs in each month from January 2012 through June 26, 2013.  The store sold $1,360,807.09 of SCs during this timeframe, or 74 percent of the store's total sales of $1,826,651.92.

3

For purposes of the forfeiture hearing, Hare prepared Government Forfeiture Exhibit 1, which focuses on certain brands of SCs that were physically removed from the stores, and from Al Sharairei's residence, that had been tested by the Drug Enforcement Agency (DEA) and were confirmed to be SCs. Government Forfeiture Exhibit 1 focuses on sales from January 2013 to June 26, 2013. Hare testified that the store's sales continued and even increased after the search and seizure in June 2013. He opined that the profit from the conspiracy and operation of the drug-involved premises exceeded the sum the Government seeks as a money judgment. Judge Roberts also made findings of fact based on the PSR, noting that Al Sharairei has raised objections to some of those paragraphs. *See* Doc. 157 at ¶¶ 15, 16, 23.

Judge Roberts concluded the Government had met its burden to show by a preponderance of the evidence that the amount it seeks is for proceeds of the illegal operation of the store and the conspiracy and that it is entitled to a money judgment of $425,000. First, he reasoned there was ample evidence that Al Sharairei was engaged in the sale of analogue substances before January 2012 and after the June 26, 2013 seizure. This included observations by law enforcement, controlled purchases, testimony of witnesses and sales records. Second, he rejected Al Sharairei's argument that the Government could not prove the sales were for SCs if not all the substances had been tested. He noted the jury determined that the "botanical sachets" sold at Puff N Stuff II were for human consumption and contained SCs in finding Al Sharairei guilty. It is not necessary to determine whether each sachet contained SCs in determining the amount of the judgment that reflects the proceeds derived from the crimes.

In any event, Judge Roberts observed that the jury verdict established a conspiracy to distribute illegal substances from January 2012 to November 2013 and, thus, the conspiracy includes the six-month time period of January 2013 through June 26, 2013, that the Government relies on to establish the basis for a judgment. The jury also rejected Al Sharairei's defense that he did not know that the products contained SCs or that his customers intended to consume the products rather than use them as potpourri. Judge

4

Roberts explained the evidence supports the conclusion that Al Sharairei knew the sachets were being sold for human consumption as he had smoked some himself and the brand names, such as "Lights Out" and "Head Trip," were consistent with drug use. Finally, Judge Roberts noted that two brands of products that tested positive for PB-22 and 5F-PB-22 alone generated gross sales of more than $421,000. Because $1,360,807.09 of the store's sales resulted from the sale of sachets during only a part of the proven conspiracy, Judge Roberts concluded that the requested forfeiture judgment of $425,000 was reasonably and conservatively extrapolated from the evidence and proven by a preponderance of the evidence. Judge Roberts also rejected Al Sharairei's estoppel and Eighth Amendment arguments.

### B.    Objections

#### 1.    Findings of Fact

Al Sharairei first objects to the reliance on trial testimony regarding Al Sharairei's communications with SC distributor, Charles Wolfe. He notes that these discussions occurred after the June 26, 2013, seizure, at which point Al Sharairei was voluntarily in contact with the authorities about the SCs that had been sold at his store.

This objection is overruled. Throughout his objections, Al Sharairei challenges the calculation of the money judgment based on his alleged lack of knowledge. As provided in the jury instructions, the prosecution could prove Al Sharairei's knowledge by: (a) demonstrating that the defendant knew that the substance with which he was dealing is subject to federal drug laws, regardless of whether he knew the particular identity of the substance; or (b) by demonstrating that the defendant knew the identity of the specific controlled substance analogue that he was dealing with, even if he did not know its legal status as a controlled substance analogue. Doc. 120-1 at 8. A defendant knows the specific controlled substance analogue he was dealing with if he knew: (i) that the substance had a chemical structure that was substantially similar to any controlled substance in Schedule I or II of the Controlled Substances Act and (ii) that the substance

5

either actually had, or the defendant represented or intended it to have, an effect on the central nervous system that is substantially similar to or greater than any controlled substance in Schedule I or II of the Controlled Substances Act. *Id.* at 8-9. Al Sharairei's conversations with Wolfe on how to avoid law enforcement attention and the comparative highs of different chemicals were relevant to the knowledge element of the offenses. In any event, this finding was merely summarizing the trial testimony concerning Al Sharairei's relationship with Wolfe and did so accurately. For these reasons, this objection is overruled.

Second, Al Sharairei objects to the reference to "controlled purchases" of SC products, noting there was only one purchase by an undercover law enforcement officer prior to the June 26, 2013, search and seizure. He argues the term is misleading as the purchase was made in the usual course of business and from an employee who believed the items sold were legal.

This objection is sustained to the extent it refers to more than one controlled purchase. The testimony at trial was that two Cedar Rapids police officers went undercover to the store on May 28, 2013, purchased two packages and sent them to the DEA laboratory. *See* Doc. 137 at 94-98. The objection is overruled to the extent it challenges the use of "controlled purchase" to refer to this operation. Given that the purchase was made by undercover law enforcement, audio recorded and sent to the DEA laboratory for testing, it was indeed, a controlled purchase.

Third, Al Sharairei objects to the finding that two brands of products that tested positive for PB-22 and 5F-PB-22 alone generated gross sales of more than $421,000 and to the insinuation that items sold prior to the raid also contained these substances, noting that none of the substances sold prior to the June 26, 2013, seizure had been tested to determine what they contained. He also notes that figures in the June 26, 2013, column in Government Forfeiture Exhibit 1 cannot be used to determine the proceeds from the sale of SCs because the items seized on June 26, 2013, had not been sold.

6

This objection is sustained to the extent it challenges the reference to only two brands. Government Forfeiture Exhibit 1 (which is a condensed sales analysis of Government Trial Exhibit 114), shows gross sales for 12 brands from January 2013 through June 26, 2013, generating sales of $421,477.59. Doc. 168. Al Sharairei's objection is otherwise overruled to the extent he argues not all of these substances were tested prior to the June 2013 search or that it is not clear whether the June 26, 2013 column in Government Forfeiture Exhibit 1 assigns value to the items seized on June 26, 2013. Hare testified that the brands listed in Government Forfeiture Exhibit 1 were seized from the store in June 2013, or from Al Sharairei's residence August 2013, and were tested by the DEA. Doc. 179 at 18. He also testified that the reason for including the six-month time period – January 2013 through June 26, 2013 – was that the chemical substance of the products would change over time, making it more likely that products sold closer to the time that the same brand products were confiscated and tested would contain similar chemical substances. *Id.* at 19. In other words, the products tested in June or August 2013 were likely to be similar to the products sold in January through June 2013, but could have differed, chemically, from products sold in January 2012.

Hare testified at trial that the sales identified in Government Trial Exhibit 114 (of which Government Forfeiture Exhibit 1 is a subset) came from point-of-sale register records contained on a computer that was seized from the store. Doc. 138 at 109-16. He also clarified at the hearing that the $421,477.69 in sales were from January 2013 leading up to June 26, 2013 and that the products seized on June 26 were not a part of the sales reflected on that spreadsheet. Doc. 179 at 26, 30, 34. Therefore, Al Sharairei's concern that the Government was assigning value to items seized on June 26, 2013, is contradicted by the record.

Fourth, Al Sharairei objects to a finding that he made an admission in pretrial custody that he was facing a "two-million-dollar K2 case." He argues there is no evidence that he made any identified amount of money selling illegal analogues after the search and seizure and denies that he made statements about a "two-million-dollar" K2

7

case or that he knowingly distributed any controlled substance analogues prior to the June 26, 2013 seizure.

This objection is overruled. Gilbert Brutley testified at trial that while he was housed with Al Sharairei at the Linn County jail, Al Sharairei said he was facing a two-million-dollar K2 case. Doc. 138 at 91-93. The evidence supports this finding of fact, which is merely that Al Sharairei made the statement while in pretrial custody.

Fifth, Al Sharairei objects to the finding that by focusing on a six-month window prior to the seizure, the Government attempts to limit its judgment to an amount of proceeds derived from the sale of items it believed to be a reasonable degree of confidence to be illegal. Al Sharairei denies there is evidence supporting a finding that the proceeds cited in Government Forfeiture Exhibit 1 were derived from the sale of illegal substances, let alone that he knew the substances were illegal.

This objection is overruled. As discussed above, this finding is based on Hare's testimony. Other supporting evidence includes that Al Sharairei told Brutley that he was buying between seven and eight kilograms of K2 at a time. Doc. 138 at 94. It is reasonable to conclude that brands that were tested at the end of June 2013 and found to contain controlled substance analogues also contained controlled substance analogues when they were sold earlier that same year.

Sixth, Al Sharairei objects to a finding based on Hare's testimony that the store's sales increased after the seizure in June 2013. He notes that Hare does not have personal knowledge or documentary evidence to support this assertion, nor that the items sold were controlled substance analogues.

This objection is overruled. Hare testified that law enforcement interviewed Al Sharairei in January 2014. Hare had listened to an audio recording of this interview. Hare then participated in an interview later in 2014. Doc. 179 at 21. Hare testified that during one of these interviews, Al Sharairei stated that he kept selling SCs after the search warrant and his sales and profits went up. *Id.* Al Sharairei said he previously may have sold $3,000 to $4,000 a day, but after the search warrant, he had days where his gross

8

sales were anywhere from $10,000 to $20,000. *Id.* at 22. This was at least until fall 2013, when Al Sharairei moved to Colorado. *Id.* Michael Tiegen also testified at trial that he was a customer of Puff N Stuff II in summer 2013. Doc. 137 at 167-70. He testified that he continued buying K2 products from Puff N Stuff II after the search. *Id.* Al Sharairei also told law enforcement that he and Wolfe were discussing a new chemical being used in products in November or December 2013. Doc. 137 at 83-84. Because Hare's testimony was based on Al Sharairei's own statements, this objection is overruled.

Seventh, Al Sharairei objects to findings based on the PSR, noting that they are incomplete. He notes that the reason this information is available is because the store was being operated openly and its operators believed the items sold were legal, and thus kept detailed sales records.

This objection is overruled. The sales figures relied on in paragraph 15 of the PSR cited in the R&R come from Puff N Stuff II's own computer data. The other two paragraphs cited in the PSR (paragraphs 16 and 23), are based on statements from defendant's wife, and co-owner of Puff N Stuff II, co-defendant Melissa Al Sharairei, and from Al Sharairei himself. Again, this objection is directed at Al Sharairei's knowledge. The jury determined that this element was met.

Finally, Al Sharairei objects to a finding that Al Sharairei told a cell mate at the Linn County Correctional Center that he marked up his SC products at least 300 percent over his purchase price. He notes that at trial, store employees testified Al Sharairei was not very involved in the day-to-day operation of the store and there was no testimony regarding how pricing was determined and by whom. He contends that a statement from a jailhouse informant is unreliable. This information comes from paragraph 23 of the PSR, which cites the discovery file. I have no other context or information supporting this finding. For purposes of this forfeiture proceeding, I will sustain the objection as it has little bearing on the amount of money judgment.

9

## 2.    *Legal Conclusions*

Al Sharairei objects to the conclusion that the Government has shown by a preponderance of the evidence that the amount it seeks is for proceeds of the illegal operation of the store and the conspiracy. He contends this is based on an assumption that all SCs sold prior to the June 26, 2013 seizure were illegal and that Al Sharairei knew they were illegal. He states the record does not support this inference, noting that there is no evidence that Al Sharairei knew that the chemical structure of the SCs being sold were substantially similar to the chemical structure of controlled substances and were therefore, illegal. He also notes that he operated the store openly, employees testified they believed they were selling legal substances and he made efforts to ensure illegal substances were not sold. Law enforcement also came to the store and never advised anyone to stop selling illegal substances.

This objection is overruled. As discussed above, the knowledge element did not require the jury to conclude that Al Sharairei knew that the chemical structure of the SCs were substantially similar to the chemical structure of controlled substances. Rather, the jury could have found the knowledge element was met by finding that Al Sharairei knew that the substances he was selling were subject to federal drug laws. As discussed in my order on Al Sharairei's motion for acquittal or new trial, there is sufficient evidence in the record to support that finding. Doc. 156 at 12-15. The jury also heard the evidence regarding the open operation of the store, testimony from employees regarding their understanding of the legality of the products and that officers had previously entered the store without incident. Nonetheless, the jury determined that Al Sharairei had the requisite knowledge and sufficient evidence in the record supports that determination. As to the purported assumption that all SCs sold prior to the June 26, 2013 seizure were illegal, I will address that argument below as Al Sharairei makes additional arguments on that issue.

Al Sharairei also objects to the conclusion that there is evidence he was engaged in the sale of analogue substances before January 2012 or after June 2013. With regard

10

to the period before January 2012, he notes that Government Forfeiture Exhibit 1 is based on sales starting in January 2013. After June 2013, he argues his report to law enforcement in August 2013 concerning a theft of a large amount of the remaining SCs from his vehicle at his residence supports his position that he did not know the substances were illegal. Al Sharairei further maintains that other post-June 2013 conduct does not provide a basis for proceeds, such as a 2014 interview in which Al Sharairei admitted to continuing to sell his products after the June 26, 2013, seizure and that his sales had increased.

The objection is sustained as to whether there was evidence that Al Sharairei was engaged in the sale of analogue substances prior to January 2012. I suspect this a typographical error and should actually be January 2013, as reflected in Government Forfeiture Exhibit 1. The jury concluded Al Sharairei was guilty of Counts 1 and 2 based on a time period of "from at least January 2012 continuing through at least June 26, 2013." Doc. 120-1 at 7, 10. The remainder of the objection is overruled for the previously-discussed reasons related to Al Sharairei's knowledge. With regard to the increase in sales, Hare testified at the hearing that Al Sharairei reported that his sales and profits had increased such that he went from $3,000 to $4,000 days in daily gross sales to $10,000 to $20,000 days in daily gross sales after the seizure. Doc. 179 at 21-22.

Al Sharairei next objects to the assumption that every sachet sold from January to June of 2013 contained an illegal SC, including those identified in Government Forfeiture Exhibit 1. He argues the evidence does not show that substances sold prior to the June 2013 seizure were the same substances that were found in the store during the search and seizure. He notes the evidence showed that the substances were being altered by distributors for the very purpose of keeping them from being illegal. Also, the packaging reveals nothing about the chemical structure of the substances. In other words, a packet of "Bizarro" sold in January 2013 cannot be presumed to contain the same substance as a packet of "Bizarro" sold in June 2013. The substances seized during the June 2013 search had different names on the packaging but were plant material with the same

11

substance sprayed on it.  He also argues that the chemists who testified at trial disagreed about whether the substances found in the store in June 2013 were substantially similar in chemical structure to a controlled substance.  Because there was no seizure, testing or other documentation of substances being sold prior to June 2013, he argues one cannot determine whether the chemical structure of those substances is substantially similar to a controlled substance.

"[T]he law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture."  *United States v. Prather*, 456 F. App'x 622, 626 (8th Cir. 2012) (quoting *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011)).  "[D]istrict courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence."  *Id.*  The evidence at trial established that each of the "products" listed in Government Forfeiture Exhibit 1 was tested and determined to contain either PB-22, 5F-PB-22 or both.  *See* Docs. 129-2 through 129-31.  Sales receipts from store's computer established that two of these "brands" had been sold in January and February 2013, one in March and April 2013, five in May 2013 and all 12 in June 2013.  Doc. 168.  Therefore, Al Sharairei's concern about the products in Government Forfeiture Exhibit 1 not being the same in June 2013 as in January 2013 is limited to only two "brands" – Darkness and Bizarro – because no other "brands" seized on June 26, 2013 and tested were being sold prior to May 2013.

Al Sharairei told law enforcement that he switched suppliers and began buying from Wolfe in spring 2013 and had made him his full supplier by June 2013.  Doc. 137 at 75-78.  This does not mean, however, that products sold at Puff N Stuff II before Wolfe came on as a supplier were not controlled substance analogues.  Indeed, the evidence suggests otherwise.  First, there is the jury verdict finding Al Sharairei guilty beyond a reasonable doubt of maintaining a drug-involved premises and conspiracy to distribute controlled substance analogues since at least January 2012.  Second, the evidence showed Al Sharairei connected with Wolfe after his previous supplier had been

getting a lot of attention from law enforcement and was getting out of the business. Doc. 137 at 77-78. Third, Government Trial Exhibit 114 shows that many "brands" sold in June 2013 had previously been sold by Puff N Stuff II. *See* Doc. 129-34 (including "Dead Man Walking," "Darkness," "Head Trip," "Lights Out," "OMG," "Caution," and "Bizarro"). Fourth, Al Sharairei told Brutley that he bought seven to eight kilograms of K2 at a time.[1] Doc. 138 at 94. Fifth, as reflected in Government Trial Exhibit 114, the profits from "botanical sachets" made up 70 percent or more of the total monthly sales for Puff N Stuff II from January 2012 and continuing through June 26, 2013 (with the exception of September 2012, when they made up 58 percent of monthly sales). *See* Doc. 129-34 at 3. Sixth, the names of these "botanical sachets" were "consistent with drug use and not scents to freshen up a family room" as noted by Judge Roberts. Doc. 175 at 13.

For these reasons and given the preponderance of the evidence standard, it is reasonable to conclude that "botanical sachet" products sold prior to the June 26, 2013, seizure were controlled substance analogues even though these products had not been tested. It is also fair to conclude that the sales of these products exceed the $425,000 money judgment sought by the Government.

Finally, Al Sharairei objects to the conclusion that two brands of products that tested positive for PB-22 and 5F-PB-22 alone generated gross sales of more than $421,000. He states this is not accurate because the only substances that contained PB-22 or 5F-PB-22 that were sold at the store prior to June 2013 were purchased in late May 2013. The other substances tested and found to contain PB-22 or 5F-PB-22 were seized on June 26, 2013, and thus, did not generate any revenue. Again, he emphasizes that the brand names are meaningless because the record shows that the contents of the brands contained the same chemical substance(s). Additionally, distributors were constantly changing the substance applied to plant material to stay ahead of regulations. He argues

---

[1] Each packet weighed anywhere from 1 to 10 grams. *See* Doc. 129-4 at 8-15.

that it is pure speculation to conclude the substances identified in Government Forfeiture Exhibit 1 were illegal.

This objection is overruled for the same reasons discussed above. The 12 brands of products that were seized and tested positive for PB-22 and 5F-PB-22 generated approximately $421,000 in the six months *prior* to the search and seizure. The data in Government Forfeiture Exhibit 1 comes from Puff N Stuff II's own records of sales. While these products were not tested prior to May and June 2013, it is reasonable to conclude they also contained controlled substance analogues based on the evidence presented at trial.

I find the entry of a money judgment in the amount of $425,000 to be appropriate based on the evidence presented in Government Forfeiture Exhibit 1, the evidence at trial and the evidence from forfeiture hearing. I agree with Judge Roberts that this is a conservative amount, as the evidence shows that $1,360,807.09 of the store's sales resulted from the sale of botanical sachets from January 2012 through June 26, 2013, and evidence in the record suggests that Al Sharairei continued to sell these sachets through the fall 2013. Based on the evidence presented, it is reasonable to conclude that the sachets sold before and after June 26, 2013, also contained controlled substance analogues. The Government has met its burden of proving the forfeiture amount of $425,000 by a preponderance of the evidence.

## C.    *Estoppel*

Al Sharairei objects to the R&R's reasons for rejecting his estoppel defense. He acknowledges that while law enforcement may "probe the depth and extent of a criminal enterprise," *see United States v. Torres*, 563 F.3d 731, 734-35 (8th Cir. 2009), there was almost no investigatory "probing" in this case. Law enforcement purchased a packet of SCs in late May 2013, but prior to that, police had been in the store several times without incident. While law enforcement did not make a representation that Al Sharairei

would not be prosecuted for selling SCs, Al Sharairei argues that its conduct implied as much.

This objection is overruled. In the cases Al Sharairei cites, the investigating agencies made affirmative representations to the defendants. *See Fredericks v. C.I.R.*, 126 F.3d 433 (3d Cir. 1997) and *Fed. Deposit Ins. Corp. v. Harrison*, 735 F.2d 408 (11th Cir. 1984). While conduct may be sufficient to establish an estoppel defense in some instances, Al Sharairei has cited no authority establishing that law enforcement's conduct in this case could be considered "affirmative misconduct," *Chien-Shih Wang v. Attorney Gen. of the United States*, 823 F.2d 1273, 1276 (8th Cir. 1987), or the other traditional elements of estoppel. *See Rutten v. United States*, 299 F.3d 993, 995 (8th Cir. 2002) (other elements include government intent to induce the claimant to act on the misrepresentation, the claimant's lack of knowledge or inability to obtain true facts and the claimant's reliance on the misrepresentation to his detriment). Al Sharairei has not attempted to prove those elements even after Judge Roberts explained in the R&R that he did not establish that he relied upon law enforcement's alleged inaction in any way or even that he was personally aware of law enforcement's presence in the store, as this testimony was provided by employees. Finally, Al Sharairei did not address Judge Roberts' other concern as to how the United States might be estopped by the actions of local law enforcement. I agree with Judge Roberts' analysis of this issue and find that Al Sharairei has failed to prove the elements of equitable estoppel.

### D. Eighth Amendment

Al Sharairei objects to the finding that a $425,000.00 money judgment would not be disproportionate to the offense. He also argues that his lack of assets should be taken into account

With regard to proportionality, Al Sharairei's arguments are limited to his challenges that the record does not support that he obtained any specific amount of proceeds from the sale of illegal substances because no substances were tested prior to

15

May 2013. For the reasons discussed above, it was reasonable to conclude that untested substances that had been sold prior to May 2013 and after the search on June 26, 2013, also contained controlled substance analogues. This objection is overruled.

With regard to his lack of assets, Judge Roberts discussed *United States v. Smith*, 656 F.3d 821, 828-29 (8th Cir. 2011), which concluded that a money judgment does not violate the Excessive Fines Clause of the Eighth Amendment when a defendant is unable to satisfy a forfeiture at the time of conviction. *Smith* explained that "[a] defendant's inability to satisfy a forfeiture at the time of conviction, in and of itself, is not at all sufficient to render a forfeiture unconstitutional, *nor is it even the correct inquiry*." *Smith*, 656 F.3d at 828 (quoting *United States v. Levesque*, 546 F.3d 78, 85 (1st Cir. 2008)).

Al Sharairei argues that *Smith* was put in doubt by *Timbs v. Indiana*, 139 S. Ct. 682 (2019). In that case, the Court considered whether the Eighth Amendment's Excessive Fines Clause was applicable to the states under the Fourteenth Amendment. *Timbs*, 139 S. Ct. at 686. The Court examined the history behind the Clause all the way back to the Magna Carta and up to its adoption. *Id.* at 687-88. Al Sharairei relies on this history that economic sanctions "be proportioned to the wrong" and "not be so large as to deprive [an offender] of his livelihood" to suggest that *Smith* is called into question. However, *Timbs* also recognized *United States v. Bajakajian*, 524 U.S. 321, 337 (1998), as taking no position on the question of whether a person's income and wealth are relevant considerations in judging the excessiveness of a fine. *Id.* at 688. *Timbs* does not address the relevant issue here, which is whether a defendant's current lack of assets should prevent a money judgment under the Eighth Amendment. In support of his argument, Al Sharairei cites cases from Oregon, Pennsylvania and Colorado courts, arguing that a forfeiture must be proportional to the offense and his financial circumstances.

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334.

16

A forfeiture violates the Excessive Fines Clause if "the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense." *Id.* at 337. The Supreme Court has not addressed the issue of whether a court may consider a defendant's ability to pay when considering the amount of a forfeiture money judgment. At least the First, Second, Third, Fourth, Sixth, Seventh, Eighth and Ninth Circuits have concluded that money judgments are appropriate under § 853, even in cases of insolvent defendants. *See United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006) ("even if a defendant does not have sufficient funds to cover the forfeiture at the time of the conviction, the government may seize future assets to satisfy the order"); *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010) ("We join our sister courts of appeal in holding that § 853 permits imposition of a money judgment on a defendant who possesses no assets at the time of sentencing"); *United States v. Vampire Nation*, 451 F.3d 189, 203 (3d Cir. 2006) ("we join these courts of appeals in concluding that *in personam* forfeiture judgment is appropriate under 21 U.S.C. § 853, even where the amount of the judgment exceeds the defendant's available assets at the time of conviction"); *United States v. Blackman*, 746 F.3d 137, 143-44 (4th Cir. 2014) ("The fact that a defendant is indigent or otherwise lacks adequate assets to satisfy a judgment does not operate to frustrate entry of a forfeiture order."); *United States v. Hampton*, 732 F.3d 687, 692 (6th Cir. 2013) ("the amount of the forfeiture is measured by the amount of the proceeds received by a defendant – not the amount of assets a defendant retains at the time of sentencing"); *United States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000) ("the district court did not err by including such nonexistent proceeds" in the forfeiture amount); *Smith*, 656 F.3d at 828 ("Even if it appears at the time of sentencing that Smith cannot satisfy the forfeiture in the future, there is always a possibility that he might legitimately come into money"); *United States v. Casey*, 444 F.3d 1071, 1076 (9th Cir. 2006) ("Mandatory forfeiture is concerned not with how much an individual has but with how much he received in connection with the commission of the crime."). As the First Circuit explained:

There are two primary reasons for permitting money judgment as part of criminal forfeiture orders. First, criminal forfeiture is a sanction against the individual defendant rather than a judgment against the property itself. Because the sanction follows the defendant as a penalty, the government need not prove that the defendant actually has the forfeited proceeds in his possession at the time of conviction. Second, permitting a money judgment, as part of a forfeiture order, prevents a [convicted defendant] from ridding himself of his ill-gotten gains to avoid the forfeiture sanction.

*Hall*, 434 F.3d at 59.

Under current precedent, the only proportionality concern is that the amount of forfeiture "must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334. The Government has demonstrated, based on reasonable extrapolation and a preponderance of the evidence, that a money judgment in the amount of $425,000 is proportional to the gravity of the offense, which generated over $1.3 million in revenue. Al Sharairei's assets, or lack thereof, need not be considered because "[m]andatory forfeiture is concerned not with how much an individual has but with how much he received in connection with the commission of a crime." *Casey*, 444 F.3d at 1077. For these reasons, I find that the imposition of a $425,000 forfeiture money judgment does not violate the Excessive Fines Clause of the Eight Amendment of the United States Constitution.

## V. CONCLUSION

For the reasons stated herein:

1.      Al Sharairei's objections (Doc. 178) to the R&R are **sustained in part and overruled in part** as explained herein.

2.      I **accept** Judge Roberts' Report and Recommendation (Doc.175) with the exception of the limited modifications to certain factual findings as described herein. *See* 28 U.S.C. § 636(b)(1).

3.     Within **ten (10) days** of the date of this order, the Government shall submit a proposed Preliminary Order of Forfeiture, pursuant to Federal Rule of Criminal Procedure 32.2(b)(1)(A), that is consistent with this order.

**IT IS SO ORDERED.**

**DATED** this 14th day of June, 2023.

_____
Leonard T. Strand, Chief Judge